# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> KHALED ELSAYED MOHAMMAD ABO AL DAHAB A/K/A KHALED ELSAYED MOHAMMAD-ABO ALDAHAB A/K/A KHALED ELSAYED ALI MOHAMMAD A/K/A KHALED ELSAYED MOHAMED A/K/A KHALED E. MOHAMED A/K/A KHALED MOHAMED <br><br> Defendants. | Civil Action No. 15-514 (BAH) <br><br> Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

On April 8, 2015, the government filed this action against defendant Khaled Elsayed Mohammad Abo al Dahab to revoke and set aside the order admitting the defendant to citizenship and to cancel the defendant's Certificate of Naturalization, pursuant to 8 U.S.C. § 1451(a). Compl. ¶ 1, ECF No. 1. Due in part to alleged false statements and false testimony related to the defendant's applications for citizenship, the government seeks revocation of the defendant's naturalization and cancelation of his Certificate of Naturalization as both illegally procured and procured by willful misrepresentation or concealment of material facts. *Id.* ¶ 35 (citing 8 U.S.C. § 1451(a)). For the reasons stated below, the government's motion is granted.

## I. BACKGROUND

### A. Factual Background

The defendant is a native and citizen of Egypt, who entered the United States in 1986 on a nonimmigrant visitor visa. *See* Gov't Statement of Material Facts As To Which There Is No

1

Genuine Dispute ("Gov't SMF") ¶ 1, ECF No. 12-1.[1] Shortly after his arrival, the defendant married Bozena Teresa Lierno, a lawful permanent resident of the United States, whom he divorced three years later. *Id.* ¶ 2. On March 18, 1989, the defendant married Kim Annette Patterson, a citizen of the United States. *Id.* ¶ 3. Two months later, based on this marriage, Ms. Patterson filed an Immigration and Naturalization Service ("INS") Form I-130, a Petition for Alien Relative, on behalf of the defendant, and the defendant filed an INS Form I-485, an Application for Permanent Residence.[2] *Id.* ¶ 4. On July 8, 1989, the INS approved both Ms. Patterson's petition and the defendant's application, granting the defendant conditional lawful permanent residence status. *Id.* ¶ 5. Although his lawful permanent residence status was subject to revocation if he did not remain married to his citizen-spouse for at least two years, the defendant divorced Ms. Patterson just two months later on September 13, 1989. *Id.* ¶¶ 5, 6. In December 1989, the defendant married Karie A. Rottluff, a citizen of the United States. *Id.* ¶ 7.

Almost one year later, in September 1990, the defendant filed an INS Form I-131, an Application for Issuance of Permit to Reenter the United States, in anticipation of travel abroad. *Id.* ¶ 8. In this application, signed under penalty of perjury, *id.* ¶ 9, the defendant provided a mailing address abroad in Cairo, Egypt, *id.* ¶ 8(d), indicated his absence from the United States would be for a period of sixteen weeks, *id.* ¶ 8(b), and said his reason for travelling was that he might have to donate a kidney to his mother, *id.* ¶ 8(e).

---

[1] The facts in this section are drawn from assertions of fact in the government's motion for summary judgment that are supported by documentary evidence. For reasons discussed *infra*, because the defendant has not opposed the government's motion in any way, these factual assertions are assumed to be admitted. *See infra* Parts II, III.

[2] On March 1, 2003, the INS ceased to be an independent agency, with its functions transferred to different agencies. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 110 Stat. 2135 (Nov. 25, 2002). For ease of reference, however, the agency is referred to as "INS," the agency's name at the time of the relevant conduct in this matter.

On July 19, 1991, approximately three months past the deadline, the defendant filed an INS Form I-752, an Application for Waiver of Requirement to File Joint Petition for Removal of Conditions, due to his earlier divorce and remarriage. *Id.* ¶ 10. To excuse the untimeliness, the defendant claimed he was unable to file the application on time because he was in Pakistan donating a kidney to his mother, supporting this claim with a copy of his airline ticket to Pakistan along with a letter purportedly from his mother's doctor in Pakistan. *Id.* ¶¶ 11, 12. On March 9, 1992, the INS approved the defendant's request, removing the conditions on his permanent resident status. *Id.* ¶ 13.

On March 17, 1995, the defendant filed his first application for naturalization, having been a permanent resident for at least five years. *Id.* ¶ 14. In his application, signed under penalty of perjury, *id.* ¶ 15, the defendant claimed, among other things, that: (1) he resided in Reno, Nevada; (2) he had never left the United States since becoming a permanent resident in 1989; (3) he had been married only twice; (4) he had never falsely claimed to have been a United States citizen; and (5) "he had never given false testimony to obtain an immigration benefit," *id.* ¶ 14. Although INS scheduled two separate interviews for his application for naturalization, the defendant did not attend either interview, and INS subsequently denied his application as abandoned. *Id.* ¶ 16.

Over one year later, in October 1996, the defendant filed a second application for naturalization. *Id.* ¶ 17. In this application, also signed under penalty of perjury, *id.* ¶ 18, the defendant claimed that: (1) he resided in Sparks, Nevada; (2) his only absence from the United States since becoming a permanent resident was a trip to Egypt from May 1995 through November 1995 for an "emergency"; (3) he had been married only once; (4) he had never falsely

claimed to be a United States citizen; and (5) he had never given false testimony for the purpose of obtaining an immigration benefit," *id.* ¶ 17.

Later that month, INS conducted an interview of the defendant under oath. *Id.* ¶ 19. As part of the interview, an immigration officer asked the defendant to verify each of his answers on his second naturalization application.[3] *Id.* When asked about his marriages, the defendant admitted that he had been married more than once, but testified that he had only been married twice. *Id.* The defendant apparently otherwise testified consistent with his application. *See id.* At the end of the interview, the defendant signed his application, again under penalty of perjury, *id.* ¶ 20, and INS approved his application for naturalization on December 7, 1996, *id.* ¶ 21.

### B. Procedural History

On April 8, 2015, the government filed this action against the defendant to revoke and set aside the order admitting the defendant to citizenship and to cancel the defendant's Certificate of Naturalization. Compl. ¶ 1. Over the past two years, the defendant, who the government alleges currently resides in Alexandria, Egypt, Gov't Mot. Substituted Service ("Gov't Mot. Subst. Serv."), Ex. 1, Decl. of Special Agent Rami Nimri ("Nimri Decl. II") ¶ 2, ECF No. 5-1, has not responded to any of the government's filings or this Court's orders. After customary means of service proved ineffective, on August 27, 2015, this Court granted the government's motion,

---

[3]   While asking the defendant to verify his answers on the application, the immigration officer conducting the interview followed "regular agency practice of taking notes in red ink," *Maina v. Lynch*, Civil No. 15-113 (RLY-DML), 2016 WL 3476365, at *2 (S.D. Ind. June 27, 2016), writing a slash through each question number, and annotating any new or corrected answers, *see* Gov't MSJ, Ex. 20, Naturalization Quality Procedures, at 3, ECF No. 12-2 ("Officers must check off or circle in **RED** ink all N-400 questions which are asked and answered during the interview. **In order to clearly identify the applicant's responses, the check or circle marks must be made next to the N-400 answers**. All additions, deletions, changes, and annotations made by the officer, must be in **RED** ink and numbered and noted in **RED** ink within the attestation section on the last page of the N-400 before the applicant signs." (emphases in original)). Courts have often relied on these annotations when assessing whether an individual testified in accord with his application. *See, e.g.*, *United States v. Sadig*, 271 F. App'x 290, 293 (4th Cir. 2007); *Bernal v. Immigration & Naturalization Serv.*, 154 F.3d 1020, 1022 (9th Cir. 1998)*; Maina*, 2016 WL 3476365, at *2–3; *United States v. Arango*, Civil No. 09-178, 2014 WL 7179578, at *5 (D. Ariz. Dec. 17, 2014).

under Rule 4(f)(3) of the Federal Rules of Civil Procedure, for substituted service of process, and authorized the government to serve process upon the defendant by means of email and Facebook message. *See generally* Mem. Op. and Order Granting in Part and Denying in Part Gov't Mot. Subst. Serv. ("Mem. Op. Subst. Serv."), ECF No. 6. The government verified that they did so. *See* Return of Service/Affidavit of Summons and Complaint Executed at 2, ECF No. 7. According to the Federal Bureau of Investigation ("FBI"), the defendant's Facebook page "shows he was active before receiving the Summons and after receiving the Summons" and that the defendant "posted several items on Facebook before and after receiving the Summons." Gov't Mot. Summ. J. ("Gov't MSJ"), Ex. 21, Internal FBI Document dated September 21, 2015, at 2, ECF No. 12-2.[4] Yet, the defendant still did not respond.

On October 31, 2016, the government filed a motion for summary judgment. *See* Gov't MSJ, ECF No. 12. After nearly three months, the Court advised the defendant, for whom no attorney has entered an appearance, that "the Court will accept as true any factual assertions contained in affidavits or attachments submitted by the government in support of its motion for summary judgment, unless the defendant submits his own affidavits or documentary evidence showing that the government's assertions are untrue." *See* Order at 3–4, ECF No. 13 (citing *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992) (holding that a *pro se* party must be advised, when motion to dismiss may be converted to motion for summary judgment, that "'any factual assertion in the movant's affidavits will be accepted by the district judge as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the

---

[4] According to the FBI, the attempts to serve the defendant via email to three separate email addresses were unsuccessful, as all were returned as "undelivered." Gov't MSJ, Ex. 21 at 2. The FBI Special Agent handling the defendant's case also sent the Summons to the defendant via Facebook and to the defendant's son via email. *Id.* According to the document, a confidential human source learned that the defendant's son eventually contacted his father about the Summons, that the defendant informed his son that he received the Summons but would not respond, and that the defendant "did not seem like he cared." *Id.* at 2, 4.

assertion'" (quoting *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)))). This Court ordered the government to serve the order on the defendant by January 18, 2017, by email and Facebook message, and ordered the defendant to file any opposition or other response to the government's Motion for Summary Judgment on or before January 27, 2017. *Id.* at 4. To this date, the defendant has not responded.

II.     **LEGAL STANDARD**

Federal Rule of Civil Procedure Rule 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc. ("Liberty Lobby")*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*,

477 U.S. at 255 (alteration in original)). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50 (citations omitted). Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

Although a non-movant's silence in a denaturalization case does not mean a motion may be granted as conceded, *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016) (holding that under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment motions may not be granted as conceded); *United States v. Alrasheedi*, 953 F. Supp. 2d 112, 114 (D.D.C. 2013) (concluding that the heightened burden of proof in denaturalization cases means

7

that a motion for summary judgment may not be granted as conceded), Rule 56(e)(2) of the Federal Rules of Civil Procedure still permits courts to "consider [a] fact undisputed for purposes of" a motion for summary judgment, "[i]f a party . . . fails to properly address another party's assertion of fact," FED. R. CIV. P. 56(e). Accordingly, notwithstanding a non-movant's persistent refusal to respond to a motion for summary judgment, courts may accept as true any factual assertions submitted by the movant in support of its motion, unless the non-movant submits his or her own evidence showing the movant's assertions are untrue. *See Winston & Strawn, LLP*, 843 F.3d at 509; *Neal*, 963 F.2d at 456; FED. R. CIV. P. 56(e); LCvR 7(h).

### III. DISCUSSION

A defendant may not "clog the wheels of justice by crossing the international border," *Blackmer v. United States*, 49 F.2d 523, 528 (D.C. Cir. 1931), and "power still resides in the court 'to put the wheels of justice in motion,'" *Burlingame v. Manchester*, 44 App. D.C. 335, 338 (D.C. Cir. 1916) (internal quotation marks and citation omitted). Accordingly, though American citizenship is "no light trifle to be jeopardized," *Afroyim v. Rusk,* 387 U.S. 253, 267–68 (1967), it is not uncommon for courts to adjudicate motions for summary judgment in uncontested denaturalization cases, *see, e.g.*, *United States v. Georgieff*, 100 F. Supp. 3d 15, 18 (D.D.C. 2015); *Alrasheedi*, 953 F. Supp. 2d at 112; *United States v. Gayle*, 996 F. Supp. 2d 42, 47 (D. Conn. 2014). Although a motion for summary judgment may not be granted as conceded, *see Winston & Strawn, LLP*, 843 F.3d at 509; *Alrasheedi*, 953 F. Supp. 2d at 113, a court may assume uncontested facts as admitted and then "enter summary judgment . . . if, after fully considering the merits of the motion, it finds that it is warranted," *Winston & Strawn, LLP*, 843 F.3d at 507–08 (D.C. Cir. 2016) (citing FED. R. CIV. P. 56(e)(3)). As the defendant in this case has chosen to refuse to respond, *see supra* Part I.B, the assertions of fact accompanying the

government's motion for summary judgment that are supported by documentary evidence are assumed to be admitted by the defendant, s*ee Winston & Strawn, LLP*, 843 F.3d at 509 (D.C. Cir. 2016).  Consequently, the standard for denaturalization in summary judgment proceedings is discussed first, and then, based on this standard and the facts as admitted, the merits of the government's motion are considered.

### A. Standard for Denaturalization

"[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko v. United States,* 449 U.S. 490, 505 (1981) (citations omitted).  Thus, "the Government 'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship,'" *id.* (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)), and must provide "clear, unequivocal, and convincing" evidence justifying revocation, *id.* (quoting *Schneiderman v. United States,* 320 U.S. 118, 125 (1943)).  For this reason, the government cannot obtain judgment in a civil denaturalization action by default.  *Klapprott v. United States*, 335 U.S. 601, 612–13 (1949) ("[C]ourts should not . . . deprive a person of his citizenship until the Government first offers proof of its charges sufficient to satisfy the burden imposed on it, even in cases where the defendant has made default in appearance."); *see also Kungys v. United States*, 485 U.S. 759, 791–92 (1988).

At the same time, "[a]dmission to citizenship under the laws is not a right but a privilege, and, in order for an alien to avail himself of this privilege, he must comply with all the conditions imposed by the statute." *United States v. De Francis*, 50 F.2d 497, 498 (D.C. Cir. 1931); *see also Schneiderman*, 320 U.S. at 131 ("[N]aturalization is a privilege, to be given or withheld on such conditions as Congress sees fit.").  Accordingly, courts have held the government is entitled to summary judgment in denaturalization cases where it has met its high burden of proof, *see,*

*e.g.*, *United States v. Hirani*, 824 F.3d 741, 748 (8th Cir. 2016); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) ("[S]ummary judgment for the government in a denaturalization proceeding is warranted in narrow circumstances: if, viewing the evidence in the light most favorable to the naturalized citizen, there is no genuine issue of material fact as to whether clear, unequivocal, and convincing evidence supports denaturalization."); *United States v. Jean-Baptiste*, 395 F.3d 1190, 1196 (11th Cir. 2005), *United States v. Dailide*, 227 F.3d 385, 389 (6th Cir. 2000); *United States v. Koreh,* 59 F.3d 431, 438–39 (3d Cir. 1995); *United States v. Schmidt*, 923 F.2d 1253, 1257 (7th Cir. 1991), even where the defendant has failed to appear, *see, e.g.*, *Georgieff*, 100 F. Supp. 3d at 19; *Alrasheedi*, 953 F. Supp. 2d at 114; *Gayle*, 996 F. Supp. 2d at 47; *see also United States v. Moya*, 118 F. App'x 666, 668 (3d Cir. 2005) (upholding a district court's grant of an unopposed motion for summary judgment in a denaturalization case).

There are two grounds for revoking a naturalized person's citizenship: (1) if it was "illegally procured," or (2) if it was "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Where the government has met its burden of proof on either ground, courts cannot "weigh the equities in deciding whether to revoke [illegally procured] citizenship," *Fedorenko*, 449 U.S. at 516, and "district courts lack equitable discretion to refrain from entering a judgment of denaturalization," *id.* at 517.

Citizenship is "illegally procured" if an applicant did not comply with any of the "congressionally imposed prerequisites to the acquisition of citizenship." *Id.* at 506. These prerequisites include that the applicant was "lawfully admitted to the United States for permanent residence," 8 U.S.C. § 1429, and that the applicant "has been and still is a person of good moral character" for a period that begins with the application for naturalization, and continues until the applicant takes the oath of allegiance. *See* 8 U.S.C. § 1427(a)(3). One fact

precluding a finding of good moral character is if an applicant has "given false testimony for the purpose of obtaining any [immigration] benefits." 8 U.S.C. § 1101(f)(6).

Citizenship must also be revoked if it was procured as a result of an applicant's willful misrepresentation or concealment of a material fact. *See Kungys,* 485 U.S. at 767; *Alrasheedi,* 953 F. Supp. 2d at 115. This basis for revocation has the following elements: (1) a naturalized citizen misrepresented or concealed a fact; (2) the misrepresentation or concealment was willful; (3) the fact was material; and (4) the naturalized citizen procured citizenship as a result of the misrepresentation or concealment. *Kungys*, 485 U.S. at 767. Willfulness requires only knowledge of the falsity of the statement. *See Witter v. Immigration & Naturalization Serv.,* 113 F.3d 549, 554 (5th Cir. 1997) ("Proof of an intent to deceive is not required; rather, knowledge of the falsity of the representation is sufficient." (citations omitted)). A fact is material if it has "a natural tendency to influence the decisions of the [INS]." *Kungys,* 485 U.S. at 772.

### B. Analysis

The government argues the defendant's citizenship and his Certificate of Naturalization must be revoked because it was both procured illegally and by the defendant's willful misrepresentation or concealment of material facts. In support, the government has provided evidence regarding three primary occasions on which the defendant provided the government with information: (1) his first naturalization application in 1995, (2) his second naturalization application in 1996, and (3) the defendant's October 1996 naturalization interview. The government has accompanied this information with documentation showing that the defendant made false statements on each of these occasions. Indeed, throughout the immigration process,

11

the defendant provided untruthful information regarding (1) his travel history; (2) his marital history; and (3) whether he had ever claimed to be a United States citizen.[5]

First, the defendant provided INS with false information regarding his travel history in the five years preceding his applications for naturalization. The defendant stated on his first application that he had not traveled outside the United States since July 8, 1989. *See* Gov't MSJ, Ex. 13, Def.'s First Naturalization Application ("Def.'s First App."), at 1, ECF No. 12-2 (marking "no" next to the question "Have you been absent from the U.S. since becoming a permanent resident?"). On his second application, the defendant stated he had traveled outside the United States only once since becoming a permanent resident, to Egypt in 1995 for an emergency. *See id.*, Ex. 16, Def.'s Second Naturalization Application ("Def.'s Second App."), at 1, ECF No. 12-2. In September 1990, however, in anticipation of travel abroad, the defendant filed an INS Form I-131, an Application for Issuance of Permit to Reenter the United States, signed under penalty of perjury. *Id.*, Ex. 10, Def.'s Application for Issuance of Permit to Reenter the United States ("Def.'s Reenter App.") at 1, ECF No. 12-2 (stating that he would be abroad for sixteen weeks and his mailing address would be in Cairo, Egypt). The defendant explained that his reason for traveling abroad was that a "medical emergency in the family might require [him] to donate a kidney to [his] mother due to renal failure." *Id.* One year later, due to his divorce and remarriage, the defendant also filed a belated INS Form I-752, an Application for

---

[5] The government also claims that the defendant gave untrue statements about his residences and an alleged affiliation with Egyptian Islamic Jihad, a terrorist organization, supporting these claims with declarations by a single FBI Special Agent. *See* Gov't MSJ at 18–19, 25–31 (citing *id.*, Ex. 22, Decl. of Rami Nimri ("Nimri Decl. III"), ECF No. 12-2; Compl., Ex. 1, Decl. of Rami Nimri ("Nimri Decl. I"), ECF No. 1-1); *see also* Nimri Decl. II ¶ 2 (explaining that the defendant resides in Alexandria, Egypt). The government also partially supports its claims of false statements and testimony regarding the defendant's residences by providing bankruptcy documents suggesting that, as of April 30, 1996, the defendant resided in California, not Sparks or Reno, NV. *See* Gov't MSJ at 18 (citing *id.*, Ex. 19). The issue of whether these documents—standing alone and "view[ed] . . . in the light most favorable to the naturalized citizen," *Arango*, 670 F.3d at 992—would satisfy the government's high burden of providing "clear, unequivocal, and convincing" evidence need not be reached because the government's other three bases for revocation are sufficient to entitle it to summary judgment.

Waiver of Requirement to File Joint Petition for Removal of Conditions, dated received on July 19, 1991. *Id.*, Ex. 12, Def.'s Application for Waiver of Requirement to File Joint Petition for Removal of Conditions, ECF No. 12-2. In a letter to INS dated July 2, 1991, the defendant explained that his I-752 form was submitted three months late because he had to be in Pakistan donating a kidney to his mother. *Id.*, Ex. 11, Letter from Def. to INS dated July 2, 1991 ("Def.'s 1991 Letter") at 1, ECF No. 12-2.[6] Regardless of whether the reason for his trip was true, and the government avers it is not, *see* Gov't MSJ at 19 n.4, either the defendant did not travel abroad to Egypt or Pakistan, in which case his claims in his 1990 I-131 form and his 1991 letter to INS are false, or he did travel abroad and his claims regarding travel outside the United States on his first and second applications for naturalization are false.[7] Further, during his naturalization interview, the defendant orally verified under oath that, in the five years preceding his application, he had only traveled outside the United States once to Egypt in 1995. Def.'s Second App. at 1. This testimony was either false or, alternatively, shows that the defendant lied to INS—in one case, under penalty of perjury—in his 1990 and 1991 communications regarding his travel to Egypt or Pakistan. *See* Gov't MSJ, Exs. 11, 12.

Second, the defendant's statements regarding his marital history on both his naturalization applications are false. *See* Def.'s First App. at 2; Def.'s Second App. at 2. By the

---

[6] In the letter, the defendant states he enclosed both a "copy of the round trip airline ticket to Pakistan and a letter from [his] mothers [sic] doctor." Def.'s 1991 Letter at 1. The letter purported to be from the defendant's mother's doctor is included in the record, *see id.* at 2, but copies of the airline tickets are not.

[7] The government does not explain the apparent inconsistency between the 1990 I-131 form and the 1991 letter to INS. According to the defendant's 1990 I-131 form, his proposed date of departure was October 1, 1990. Def.'s Reenter App. at 1. On the form, the defendant also stated he intended to be abroad for sixteen weeks and his mailing address abroad was to be in Cairo, Egypt. *Id.* By contrast, in his 1991 letter to INS, the defendant states that he had "round trip airline tickets" to Pakistan, left on May 4, 1991, and returned in June 1991. Def.'s 1991 Letter at 1. Thus, from the record, it is entirely unclear whether, in 1990 or 1991, the defendant traveled to Egypt, Pakistan, both, or neither. Regardless, the defendant did not acknowledge either trip in his applications for naturalization. Accordingly, it does not matter when or where he traveled in 1990 or 1991; the defendant must have, at some point, lied to INS about his travel abroad.

time the defendant had filed his first application, the defendant had been married at least three times. Gov.'t MSJ, Exs. 2, 3, 8, 9. Thus, the defendant's statements on both applications, claiming he was married only once, are false. Further, when asked about his marriages in his immigration interview, the defendant did admit that he had incorrectly stated on the form that he had been married only once, but testified that he had been married only twice. Def.'s Second App. at 2 (showing immigration officer's annotation correcting the number of marriages from one to two). Thus, the defendant also gave false testimony regarding his marital history.

Third, the defendant stated in both applications that he had never claimed in writing, or in any other way, to be a United States citizen, *see* Def.'s First App. at 3; Def.'s Second App. at 3, which was also false. As the government shows, however, the defendant claimed on March 13, 1988 to be a United States citizen in an application for employment with the National Semiconductor Corporation.[8] Gov't MSJ, Ex. 24, Affidavit of Business Records from Texas Instruments Inc.'s HR Administrator Viola Griffin at 2, ECF No. 12-2. Moreover, the annotated version of the defendant's second application shows that the defendant orally verified that he had never claimed to be a United States citizen. Consequently, the defendant also falsely testified about never claiming to be a United States citizen.

---

[8] Although the statutory period for which good moral character is required begins five years before a naturalization application is filed, *see* 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1), Congress has specifically instructed that INS may take into consideration the applicant's conduct and acts at any time prior to that period. *See* 8 U.S.C. § 1427(e) ("In determining whether the applicant has sustained the burden of establishing good moral character . . . [INS] shall not be limited to the applicant's conduct during the [statutory period], but may take into consideration as a basis for such determination the applicant's conduct and acts at any time prior to that period."); *see also* 8 C.F.R. § 316.10(a)(2) (explaining that INS is "not limited to reviewing the applicant's conduct during the [statutory period] . . . if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character."). Thus, although the defendant's application to the National Semiconductor Corporation falls outside the five-year statutory window, the defendant's claim of United States citizenship on that application may be taken into account in the determination of whether the defendant made false statements in his applications or whether he gave false testimony.

The defendant's false testimony and statements on these three occasions establish by clear, unequivocal, and convincing—indeed, undisputed—evidence that the defendant procured his citizenship illegally. As noted, during his naturalization interviews, the defendant falsely testified about his travel and marital histories, and falsely verified that he had never claimed to be a United States citizen. Such false testimony precludes a finding of "good moral character." *See* 8 U.S.C. § 1101(f)(6) ("No person shall be regarded as, or found to be, a person of good moral character, who, during the period for which good moral character is required to be established, is, or was . . . one who has given false testimony for the purpose of obtaining any benefit under this chapter . . . ."); *see also* 8 C.F.R. § 316.10(b)(2)(vi) ("[A]pplicant shall be found to lack good moral character if . . . he has given false testimony" to obtain an immigration benefit "regardless of whether the information provided in the false testimony was material . . . ."). Accordingly, the defendant "illegally procured" his naturalization by failing to comply with one of the essential congressionally imposed prerequisites to citizenship. *See Fedorenko*, 449 U.S. at 506.

Further, the false statements on the defendant's naturalization applications and in his naturalization ceremony also require revocation of the defendant's citizenship as having been "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Even if by "viewing the evidence in the light most favorable to the naturalized citizen," *Arango*, 670 F.3d at 992, it is assumed that the defendant may have forgotten about his 1988 job application to the National Semiconductor Corporation, the defendant must have known that his statements regarding his travel and marital histories were false. *Cf. Georgieff*, 100 F. Supp. 3d at 21 (concluding a defendant "obviously knew to be false" his statements about "his marital status"). Thus, the misrepresentations were willful. *See Witter,* 113 F.3d at 554

(stating that "knowledge of the falsity of the representation is sufficient" to find willfulness (citations omitted)).

Each of these statements were also material because his answers would have had "a natural tendency to influence the decisions of the [INS]" with respect to his application. *Kungys,* 485 U.S. at 772. First, the defendant's statements about his travel history were material because continuous residence in the United States is a requirement for naturalization. *See* 8 U.S.C. § 1427(a)(2); 8 C.F.R. § 316.5(c)(1) ("Absences from the United States—(i)for continuous periods of between six (6) months and one (1) year . . . shall disrupt" the continuous residence requirement). Second, with respect to the defendant's marital history, the government is entitled "to discover what possible legal obligations, liabilities, and relationships the applicant for citizenship may have contracted in the past" including "marriages or [a] marriage ceremony." *United States v. Ali*, 557 F.3d 715, 721–22 (6th Cir. 2009). Third, false claims of United States citizenship are clearly material as such claims may constitute crimes under United States law, *see* 18 U.S.C. § 911, precluding a finding of good moral character, *see* 8 U.S.C. § 1101(f)(3); 8 C.F.R. § 316.10(b)(3)(iii). Indeed, if the defendant was in violation of § 911, the defendant would have been inadmissible and therefore ineligible for permanent residence. *See* 8 U.S.C. § 1182(a)(6)(C)(ii) (aliens who have made false representations of United States citizenship are inadmissible); 8 U.S.C. 1429 (requiring lawful admission for permanent residence); *see also id.* § 1227(a)(1)(A) (aliens who make false representations of United States citizenship are subject to removal).

Accordingly, the government has proven by clear, unequivocal, and convincing evidence that the defendant willfully misrepresented or concealed material facts and procured citizenship as a result. *See* 8 U.S.C. § 1451(a); *Kungys*, 485 U.S. at 767–77.

## IV. CONCLUSION

For the foregoing reasons, "after fully considering the merits of the" government's motion for summary judgment, *Winston & Strawn, LLP*, 843 F.3d at 508, the government has met its burden by providing clear, unequivocal, and convincing evidence that the defendant illegally procured his naturalization or that he procured his naturalization by willful misrepresentation or concealment of material facts. Consequently, the government's motion for summary judgment is GRANTED.

An appropriate order accompanies this Memorandum Opinion.

Date: April 19, 2017

_____
BERYL A. HOWELL
Chief Judge